

U.S. Department of Justice

United States Attorney
Eastern District of New York

JRS
F. #2020R00270

271 Cadman Plaza East
Brooklyn, New York 11201

May 15, 2025

By ECF

The Honorable Rachel P. Kovner
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re: United States v. Peter Weinzierl
Criminal Docket No. 20-383 (RPK)

Dear Judge Kovner:

The government respectfully submits this response to the defendant's appeal of the Honorable Marcia M. Henry's order of detention.  See ECF Nos. 15 (order of detention), 19 (defendant's appeal ("Def. App.")).  The government relies primarily on its original motion for detention (ECF No. 13 (the "Detention Memo" or "Det. Mem.")), which is incorporated herein by reference.

As set forth in the Detention Memo, the defendant is a foreign citizen with no ties to the United States, no proffered sureties, significant ties to non-extraditing countries, significant and opaque assets in non-extraditing countries, and a demonstrated history of doing everything in his power to avoid facing justice in a U.S. court.  Under those circumstances, Judge Henry appropriately held that (1) the defendant posed a serious risk of flight, and (2) the defendant's proffered bail package — a cash bond to be paid entirely by an anonymous foreign benefactor — was inadequate to mitigate that risk.  Judge Henry's order of detention should therefore be upheld.

The defendant's claims that Judge Henry erred are all without merit, for the reasons set forth below.

1. The Defendant's Lack of Prior Flight Does Not Warrant Release

The defendant's primary argument in support of bail is that he did not flee during the four years that he was fighting extradition in the United Kingdom.  See Def. App. 1-2, 3-4.  Courts, however, have repeatedly held that a defendant's lack of flight at a prior stage of a proceeding does not remove the risk that a defendant will flee at a later, more serious, stage of a proceeding.  See United States v. Khusanov, 731 F. App'x 19, 21 (2d Cir. 2018) (affirming

denial of bail for defendant who did not "flee when confederates were first apprehended"; "the court could think that a defendant would perceive a greater threat to his liberty — and, therefore, posed a greater risk of flight — when he faced actual charges rather than simply anticipated possible charges"); United States v. Wang, No. 23-CR-118 (AT), 2023 WL 4551637, at *2 (S.D.N.Y. July 14, 2023) (denying bail pretrial even though defendant "did not flee after learning that the Government began seizing funds from entities associated with her co-defendant, Kwok, or after learning about the grand jury investigation of Kwok"; "Wang is now in a categorically different position; she is facing decades in prison and . . . undoubtedly has more incentive to flee now than she did [before]"); cf. United States v. Nouri, No. 07-CR-1029 (DC), 2009 WL 2924334, at *2 (S.D.N.Y. Sept. 8, 2009) (remanding convicted defendant despite argument that "when he was on bail for two years following his arrest he made every court appearance and com[plied] fully with all the terms of his release"); United States v. Motovich, No. 21-CR-497 (WFK), July 30, 2024 Tr. 21, 31-32 (remanding convicted defendant despite argument by defense counsel "that the Defendant has been aware of the investigation for five years. He has been on bail for approximately, I believe, three and a half years. At no point has there been any indication throughout that time period that the Defendant ever intended to flee."), aff'd, No. 24-2108 (2d Cir. Sept. 10, 2024).

       The same is true here. For four years, the defendant fought extradition in the hopes that his efforts would allow him to escape the U.S. justice system. But that fight is now over. He is, at long last, here before a U.S. court with nowhere left to hide from the evidence of his crimes. His incentive to flee is thus now at its highest.[1]

       But even if the incentives were exactly the same, the bail package offered by the defendant now is substantially less than the bail package in place in the United Kingdom. There, the defendant's bail was secured by over $5 million paid by a domestic U.K. corporation. Here, the defendant seeks to be released on a $1.5 million cash bond, with an additional $1.5 million to be added at some point in the future, paid by a foreign corporation shielding an anonymous benefactor. That lesser bond cannot mitigate the now-greater risk.

       Accordingly, both because his incentive to flee is now higher and because his currently proposed bail package offers less meaningful security than what the defendant previously offered the U.K. court, the defendant's lack of prior flight does not warrant his release now.

---

[1] The defendant's arguments to Judge Henry that it would have been easier to flee from the United Kingdom than it would be to flee from the United States are, at best, debatable. To state the obvious, Britain is an island. The only practical way to leave undetected would be over water through the heavily monitored English Channel. The United States, by contrast, has a land border with Canada over 5,000 miles long and a land border with Mexico almost 2,000 miles long, both of which are notoriously porous. As set forth in the Detention Memo, numerous defendants, including many with far fewer resources than the defendant, have been able to successfully flee from prosecution in this District. See Det. Mem. 6-8 & nn.4-5.

2. <u>The Defendant's Decision to Fight Extradition Weighs Against Release</u>

The defendant's suggestion that he is being punished for exercising his rights to fight extradition misunderstands the inquiry. See Def. App. 2 n.1. When a person waives extradition and voluntarily chooses to come to the United States, that is evidence that the person is more interested in participating in U.S. legal proceedings and less interested in avoiding U.S. proceedings and therefore provides some evidence that the person is less likely to flee. Thus, there are several examples of foreign defendants who have waived extradition and then been released on bail. But when a person instead vigorously fights extradition, the opposite inference is appropriate. It is therefore unsurprising that there are few, if any, instances in this District of a non-citizen defendant fighting extradition and then being released. The government is aware of no such examples, nor does the defendant cite any. That calculus is not about punishment or reward, but about the assessment of risk.

Judge Henry therefore did not err in weighing the defendant's demonstrated resistance to appearing in a U.S. court as a factor against his release.

3. <u>The Defendant's Finances Remain Opaque</u>

The defendant states that he "is not extraordinarily wealthy, and he will be entirely forthcoming with this Court about his assets." Def. App. 2. This claim is difficult to accept, as the defendant was given the opportunity to be forthcoming with the Court about his assets and flatly refused. In his Pre-Trial Services interview, the defendant was asked to provide information about his finances and assets. Rather than being entirely forthcoming, "[a]t the advice of defense counsel, the defendant did not provide information pertaining to his assets." Pre-Trial Services Report 3.

While the defendant has now offered an unsworn attorney proffer of his assets, the Court should be hesitant to accept that proffer when the defendant has refused to disclose his assets in a setting that would subject him to liability for false statements. That is particularly so where, as Judge Henry noted, the allegations in the Indictment make clear that the defendant is skilled at moving money around the world and concealing the true source and ownership of assets.

The government, for its part, does not credit the defendant's proffer that his total assets amount to approximately €2 million. In addition to whatever the defendant earned from his years as a high-level finance executive, the government is aware from the investigation that in late 2017 the defendant used approximately €5 million of proceeds of the Odebrecht scheme deposited at Foreign Bank 2 to pay off personal loans, and in late 2018 he received a wire transfer of approximately $1.6 million into an account in the Czech Republic (which the government believes was proceeds from a property sale). The defendant has also held positions and interests in other jurisdictions in the past including Malta and Slovakia, and although he discloses on appeal a property in Moscow, in the recent U.K. extradition proceedings he submitted evidence that he was "worrie[d] about his investments in Russia and Ukraine."

3

Absent a more detailed accounting, it is not credible that all of those assets have dissipated since that time.[2]

Finally, while €2 million may not be "extraordinarily wealthy" by the defendant's standards, it is sufficient to finance flight. That is particularly so given that most of the defendant's wealth is in Russia, outside the reach of U.S. authorities, but accessible to the defendant should he flee. Accordingly, regardless of whether the defendant's proffer of his assets is accepted, his wealth weighs against release.

4. Judge Henry Did Not Err in Assessing the Strength of the Evidence

The defendant claims that Judge Henry misunderstood the state of the evidence against the defendant. See Def. App. 6-7. This claim is based on several errors of law and fact.

First, the defendant claims that the decision by the United Kingdom not to extradite as to Count 1 impacts the strength of the case. Not so. Whether or not the government can proceed on Count 1, the strength of the evidence as to Counts 2, 3, and 4 is unaffected. In particular, the government can still admit evidence of the conspiracy alleged in Count 1, can still admit statements of co-conspirators, and can still prove Counts 2, 3, and 4 through Pinkerton liability. See Det. Mem. 2 n.1. The defendant's claim that the United Kingdom's extradition decision "essentially added an additional element" for Counts 2, 3, and 4 (Def. App. 7) is also incorrect. The elements of U.S. crimes are defined by U.S. law. The U.K. court extradited the defendant to face the charges on Counts 2, 3, and 4, as those charges are alleged in the indictment and defined under U.S. law.[3]

Second, the defendant claims that the government's case "relies entirely on inference and uncorroborated hearsay." Def. App. 7. It is unclear what possible basis the defendant has for this claim given that he has not yet received a single piece of discovery. To the

---

[2] To the extent the defendant's claim is that he has already spent millions of dollars defending against extradition, such a claim would only heighten his risk of flight and the inadequacy of his proposed bail package. Flight would not only assure the defendant permanent freedom from these charges, but would also allow him to save the money that he otherwise would have to spend to prepare for trial, which could easily exceed what he spent fighting extradition.

[3] If the defendant is attempting to raise a Rule of Specialty objection, that objection fails for two reasons. First, the Rule of Specialty requires the government to proceed only on the statutory charges set forth in the extradition order, but it does not restrict the government's ability to present evidence or prove its case. See United States v. Masefield, No. 02-CR-441 (LAP), 2005 WL 236443, at *2 (S.D.N.Y. Feb. 1, 2005) ("The Court of Appeals has consistently found that the Government is not limited strictly to charges described in an extradition warrant but rather may include additional facts and additional charges as long as the statutory charge is the same."). Second, and more fundamentally, the defendant has no standing to raise any Rule of Specialty objection; only the United Kingdom can raise such an objection. See United States v. Barinas, 865 F.3d 99, 105 (2d Cir. 2017).

contrary, as the government has previously proffered, the government anticipates admitting testimony by several of the defendant's co-conspirators, which will be corroborated by emails and business records, that, among other things, "[the defendant] personally signed off on sham financial products for Foreign Bank 1 and was personally involved in negotiations relating to and the operations of Foreign Bank 2." Det. Mem. 4. Judge Henry did not err in accepting the government's proffer of that evidence. See United States v. LaFontaine, 210 F.3d 125, 131 (2d Cir. 2000) ("It is well established in this circuit that [government] proffers are permissible both in the bail determination and bail revocation contexts.").

Third, the defendant argues that the charges are barred by the statute of limitations. See Def. App. 7. The government is prepared to show that the statute of limitations was tolled pursuant to 18 U.S.C. § 3292, and the government has already discussed with defense counsel the government's intention to produce the relevant materials in discovery. If, after reviewing those materials, the defendant continues to believe he has a meritorious statute of limitations challenge, the proper avenue to raise that challenge is in a promptly filed motion to dismiss. The defendant's naked claim of a statute-of-limitations bar therefore does not warrant release.[4]

### 5. The Defendant Has Identified No Appropriate Sureties

The defendant claims that Judge Henry erred in finding that no sureties were available because the "beneficial owner" of the U.K. paper company that has proposed to pay the bond "is ready and willing to file an affidavit under seal confirming the source of the funds." Def. App. 7. As of now, the defendant has not identified who this beneficial owner is.[5] Without knowing the identity of the defendant's benefactor, the nature of that person's relationship with the defendant, and the full extent of that person's assets, it is impossible to assess whether that person is an appropriate surety, whether that person has any moral suasion over the defendant, and whether a $3 million bond is meaningful to him or her. It would certainly be relevant if the benefactor were a close relative with only $3 million in assets, which could indicate a high level of moral suasion. It would be another matter entirely if the benefactor were a billionaire closely associated with Foreign Bank 1 and Foreign Bank 2 whose interests would be best served by forfeiting $3 million to avoid personal risks from a trial.

Thus, the identity of the benefactor and other details about her or him are essential to understanding the appropriateness of the surety. If there is no moral suasion, the defendant

---

[4] For the avoidance of doubt, the government anticipates showing tolling based on various MLATs, not the single Austrian MLAT cited by the defendant.

[5] The defendant provides a link in a footnote to the U.K. company registry (Def. App. 7 n.4), which lists "William Shuttlesworth" as the sole officer of the company and lists him as a person owning 75% or more of the company's shares. It is unclear if Mr. Shuttlesworth is the beneficial owner the defendant is referring to or if he is a nominee to shield the true beneficial owner. Based on U.K. records, Mr. Shuttlesworth serves as a director for another U.K. entity that is controlled by a person closely associated with Foreign Bank 1 and Foreign Bank 2.

will have little incentive not to flee to Russia, where the U.K. paper company would in any event have little meaningful recourse to recover its $3 million from him. Because the defendant and his benefactor have deliberately withheld this critical information, any assessment of the appropriateness of the surety is impossible.

Accordingly, on the present record, Judge Henry was entirely correct to find that no appropriate sureties are available.

6. <u>The Complexity of the Case Does Not Require Release</u>

The defendant argues that he cannot be detained because he is charged in a complex, document heavy case. <u>See</u> Def. App. 9-10. But to put the point bluntly, there is no white-collar carve-out from the Bail Reform Act. It is thus unsurprising that the defendant cites not a single case holding that the volume of discovery can justify bail notwithstanding a risk of flight. To the contrary, where the statutory factors favor detention, courts have not hesitated to detain defendants, even in extraordinarily complicated white-collar schemes. <u>See, e.g.</u>, <u>United States v. Manuel Chang</u>, No. 18-CR-681 (NGG) (E.D.N.Y. July 13, 2023) (defendant detained in international money laundering and foreign bribery scheme); <u>United States v. Boustani</u>, 356 F. Supp. 3d 246 (E.D.N.Y. 2019) (same); <u>see also, e.g.</u>, <u>United States v. Zhukov</u>, No. 18-CR-633 (EK) (E.D.N.Y. Apr. 14, 2020) (defendant detained in international computer fraud scheme despite difficulties of meeting with counsel during COVID-19 pandemic). The defendant's argument that the volume of discovery requires his release should therefore be rejected.

7. <u>The Defendant's Proposal Is Inadequate</u>

The defendant argues that the government has not demonstrated that no conditions of release can reasonably mitigate the defendant's risk of flight. <u>See</u> Def. App. 8. To be clear, while it may be that no such conditions exist, the government has not made that argument. The government's sole argument is that the proposal made by the defendant — the only proposal on offer — is woefully inadequate. That is true in part because of the lack of sureties and in part because it remains totally unclear what financial or moral suasion the $1.5 million (or even $3 million) in cash offered by the defendant will have on the defendant.

Moreover, as experience has shown, conditions like GPS monitoring and home detention do little do prevent flight where a defendant has the desire and the ability to flee. <u>See</u> Det. Mem. 6-8 & nn.4-5. Defendants can and do cut off their bracelets and leave the District. While those conditions will alert the government that the defendant has fled (after a substantial lag), they do little to help find him again, especially when there is an international border 6 hours away.

Under the circumstances of this case, the government has met its burden that the conditions that have been offered are insufficient to mitigate the serious risk of flight posed by the defendant.

\*         \*         \*

For the reasons set forth herein and in the Detention Memo, Judge Henry properly held that the proposed bail package is inadequate, and the defendant should be detained. The

government therefore respectfully submits that the Court should uphold Judge Henry's order of detention and deny the appeal.

                          Respectfully submitted,

                          JOSEPH NOCELLA, JR.
                          United States Attorney

By:   /s/
      Jonathan Siegel
      Assistant U.S. Attorney
      (718) 254-6293

| MOLLY A. MOESER | LORINDA I. LARYEA |
|---|---|
| Chief, Money Laundering and Asset Recovery Section | Acting Chief, Fraud Section |
| Criminal Division | Criminal Division |
| Department of Justice | Department of Justice |

By:   /s/                           By:   /s/

Michael B. Redmann                Jil Simon
Deputy Chief, International Unit     Patrick Brown
Matthew Tannenbaum             Trial Attorneys
Trial Attorney                       1400 New York Avenue NW
1400 New York Avenue NW        Washington, DC 20005
Washington, DC 20005            (202) 445-9850
(202) 436-6891

cc:    Clerk of the Court (by ECF)
       Counsel of Record (by ECF)